PAUL R. BONANSINGA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bonansinga v. Commissioner
Docket Nos. 9767-85; 32752-85.
United States Tax Court
T.C. Memo 1987-586; 1987 Tax Ct. Memo LEXIS 575; 54 T.C.M. (CCH) 1159; T.C.M. (RIA) 87586; November 25, 1987. Steven J. Rosenberg, for the petitioner. Michael W. Bitner, for the respondent. COHEN
*576 MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In two notices of deficiency, respondent determined deficiencies in an additions to petitioner's Federal income taxes for 1980 through 1983 as follows: Additions to Tax
Docket No.
Year
Deficiency
Sec. 6653(b) [1]
Sec. 6661(a)
9767-85
1981
$ 6,964
$ 3,482
--
1982
6,860 * 3,430
$ 686
1983
3,086 ** 1,543
--
32752-85
1980
7,805
3,903
--
In the answer to docket No. 32752-85, respondent alleged that the deficiency for 1980 should be increased by $ 860 and that the addition to tax under section 6653(b) should be increased by $ 430. In an amendment to the answer in docket No. 9767-85, respondent alleged that the deficiency for 1981 should be increased by $ 702 and the addition to tax under section 6653(b) for 1981 should be increased *577 by $ 351. After concessions, the issues for determination are (1) whether petitioner had unreported income from kickbacks, bribes, and diversion of income and assets of his employer and of his reelection campaign fund; (2) whether petitioner is entitled to deductions for business use of his personal automobile; and (3) whether petitioner is liable for additions to tax for fraud. [2]
FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner was a resident of Springfield, Illinois, at the time he filed his petitions in these consolidated cases. Petitioner graduated from the University of Illinois in 1968, earning a degree in mechanical engineering. In 1971, petitioner was employed as an engineer by the City of Springfield, Illinois, Department of City Water, Light and Power (CWLP). In April 1979, petitioner was elected to the City Council as Commissioner of CWLP. During the years in issue, the City of Springfield had a Mayor-City Council form of government. Under that system, *578 each elected Councilman served as the Commissioner and was responsible for the operation of one of four departments. These departments included CWLP. CWLP provides electric, water, and sewer services for the City of Springfield and surrounding communities. During 1980 through 1983, CWLP employed approximately 650 individuals, had approximately 55,000 customers, and generated annual revenues in excess of $ 82,000,000. In 1979, Patrick Butler (Butler) became employed by CWLP and initially served as Director of Labor Relations. Butler remained in this position for approximately 1 year, at which time he was promoted to the position of Manager of Administrative Services. As Manager of Administrative Services for CWLP, Butler reported directly to petitioner in his capacity as Commissioner of CWLP. In January 1980, Steve Copley (Copley) was employed by CWLP as the Director of Financial Planning/Manager of Finance. He was responsible for the financial administration of CWLP, with duties including negotiating and renegotiating coal fines contracts for CWLP. He also supervised the coal planning needs for CWLP, which included working with the operating committee at the power plant. *579 James Hankins (Hankins) was employed by CWLP as the Supervisor of Scrubber Operations and Waste Treatment. Conversion of City Property
Roof Trusses -- In 1980, CWLP operated a wildlife sanctuary at Lake Springfield. As Manager of Administrative Services, Butler's duties included, among other things, supervising those CWLP personnel who maintained the wildlife sanctuary. In 1980, petitioner's brother, Tim Bonansinga, was living on a farm located north of Springfield, Illinois. In the fall of 1980, petitioner told Butler that a building was needed at Tim Bonansinga's firm, that the building would be similar to the structures at CWLP's wildlife sanctuary, and that the materials required for the building at the farm would be the same as those used to construct the CWLP structures. In October 1980, Butler directed that the City of Springfield purchase building materials from Vredenburgh Lumber Company. The materials included 25 roof trusses at $ 28.28 each. On October 6, 1980, the building materials, including the roof trusses, were delivered to the CWLP wildlife sanctuary. Butler informed petitioner that the materials had been delivered. Approximately 1 week after *580 he informed petitioner of the delivery of the building materials, Butler contacted William Seman (Seman), a self-employed contractor doing business in Springfield, to inquire whether Butler could borrow one of Seman's trucks to haul the building materials. Butler suggested to petitioner that the building materials be transported from the wildlife sanctuary to Tim Bonansinga's residence. Butler, Seman, and petitioner drove to the wildlife sanctuary in Seman's truck, loaded at least 16 of the roof trusses onto the truck, and transported them to and unloaded them at Tim Bonansinga's farm. During the summer of 1982, Tim Bonansinga contacted Seman about storing some building materials at Seman's residence. Thereafter approximately 20 roof trusses were delivered to Seman's residence. In the spring of 1983, Seman was constructing a garage for petitioner at petitioner's residence. Seman never ordered any roof trusses for use in building the garage. Petitioner informed Seman that petitioner would be going to Seman's residence to pick up roof trusses. Petitioner, along with Hankins and Copley, drove to Seman's residence in a rental truck and loaded approximately 24 roof trusses onto *581 the truck. The trusses were then delivered to petitioner's residence, where they were used to build the roof of the garage then under construction.
Labor -- During the summer of 1983, Butler worked on petitioner's garage for at least 40 hours, and Copley worked on petitioner's garage at least 2 full days. During this period, Butler was earning $ 3,400 per month from CWLP and Copley was earning $ 13 per hour as a summer employee of CWLP between semesters of law school.
Supplies -- Petitioner is an automobile enthusiast, whose hobbies include rebuilding engines and automobile bodywork. Petitioner used the barn at Tim Bonansinga's farm as a garage. During 1980, Carlo Catalano (Catalano) was employed by CWLP as Superintendent of Automotive Maintenance, and was responsible for the supervision of approximately 20 employees and the maintenance of approximately 200 cars operated by CWLP. In November 1980, Catalano attended an automobile supplier's trade show in Missouri and purchased two sanders on behalf of CWLP. Within a day or two after his return from the trade show, Catalano spoke to petitioner about the sanders Catalano had just purchased. During that conversation, *582 Catalano indicated that a similar sander could be ordered for petitioner. Catalano thereafter ordered the sander for petitioner, which sander was paid for by the City of Springfield at a price of $ 39.50 and was received by CWLP on November 7, 1980. The sander was then delivered to petitioner. In July 1981, Hankins, at petitioner's direction, ordered $ 985.12 worth of various automobile paints and other liquid suuplies from Springfield Auto Supply Company. These materials were paid for by the City of Springfield but were never delivered to CWLP. Instead, Hankins delivered such materials to petitioner at petitioner's former residence and at Tim Bonansinga's farm. In 1982, Hankins, at petitioner's direction, ordered $ 341.92 worth of various automobile supplies from S-M-W Auto Supplies. These materials were paid for by the City of Springfield but were delivered by Hankins to petitioner. During 1982, as Manager of Administrative Services, Butler was Catalano's direct supervisor. During that time, Butler approached Catalano about purchasing automoible supplies for petitioner's use. Thereafter, Catalano ordered sandpaper and buffing pads worth at least $ 57, which items were *583 paid for by the City of Springfield. Catalano caused such supplies to later be placed in a CWLP car operated by Butler. Upon his receipt of these supplies, Butler delivered them to petitioner.
VCR -- In January 1981, CWLP purchased a video cassette recorder (VCR) for $ 1,350 from The Platter. The VCR was purchased for use in training in CWLP's Personnel Department. A few months later, petitioner removed the VCR to his personal residence. He used it to tape automobile racing, movies, and the news. After several months, petitioner moved the VCR back to his office and kept it in a cabinet in the bathroom of his office, occasionally taking it to his residence for personal use. In late 1982, petitioner took the VCR to his home for use in his campaign. The campaign fund paid for certain repairs to the VCR. The VCR remained at petitioner's residence until March 1984. When the VCR was returned to CWLP, it was inoperable and required approximately $ 400 in repairs. Campaign Contributions/Kickbacks
CWLP burns raw coal to generate electricity. CWLP mixes coal fines, a by-product generated from the mining of raw coal, with raw coal in this process. During 1980 through *584 1983, Bittle Coal Company, Marion, Illinois, was owned and operated by Richard Bittle (Bittle). On two occasions in 1980, Bittle delivered $ 2,500 in cash to Copley as contributions to petitioner's campaign for reelection as Commissioner of CWLP. On the first occasion, Copley kept $ 200 for himself and delivered the balance to petitioner in petitioner's automobile on the way to work. Copley left the second contribution in petitioner's office. Neither of the contributions were reported on the Report of Campaign Contributions or Annual Report of Campaign Contributions and Expenditures for the Committee to Re-Elect Paul Bonansinga, Commissioner of Public Property, filed for the periods July 1, 1979, through June 30, 1980, or July 1, 1980, through June 30, 1981. In January 1980, a meeting was arranged among Bittle, Copley, and Hankins regarding the potential sale by Bittle Coal Company of coal fines to CWLP. Copley thereafter negotiated a contract with Bittle for the sale of coal fines by Bittle Coal Companny to CWLP. Petitioner was not present during the negotiations. The contract, adopted by the City on April 29, 1980, authorized CWLP to purchase a maximum of 20,000 tons *585 of coal fines at a cost of $ 19 per ton and expired on April 1, 1981. Bittle paid a "finder's fee" of $ 1 per ton on the first 2 weeks tonnage delivered to CWLP, or $ 1,121, to Ron Lance, who had arranged the January 1980 meeting. Subsequent to the execution of the contract, Bittle had dinner with Hankins and Copley when Bittle was in Springfield. Copley also provided assistance to Bittle in causing checks due to Bittle Coal Company from CWLP to be issued on an expedited basis. On more than one occasion, Bittle discussed with Hankins the finder's fee that he had paid in relation to the contract. Bittle also indicated to Hankins that Bittle might be willing to make a similar "arrangement" with Hankins in regard to coal fines that were sold to CWLP. Hankins discussed the possibility of an "arrangement" with petitioner. Initially, petitioner proposed to Hankins a contract with an increase, to be divided among petitioner, Hankins and Tim Bonansinga. Subsequently, petitioner proposed an initial payment of $ 5,000 and an increase of $ 1.50 per ton to be paid by CWLP to Bittle Coal Company, $ 1.00 which was to be paid by Bittle to petitioner and Hankins. The possibility of an *586 increase in price had not been suggested by Bittle and originated with petitioner. After meetings with petitioner, Hankins took to Bittle a proposed renewal contract drafted by petitioner to reflect a $ 1.50 per ton price increase. No negotiations occurred. Bittle simply signed the proposed renewal contract presented to him by Hankins, and Hankins returned the executed contract to petitioner. On March 24, 1981, while Copley was on vacation, petitioner presented the renewal contract to the City Council. The proposed contract authorized CWLP to purchase up to 80,000 tons of coal fines at a cost of $ 20.50 per ton over a 2-year period. The contract contained a clause negating any minimum purchase requirement by the City. The renewal contract was presented to the City Council by petitioner without consultations with Copley or with Ellis Loper (Loper), Fuels Manager at CWLP. Loper was responsible for scheduling all coal and coal fines shipments to be received by CWLP, as well as being involved in making recommendations in regard to negotiating coal and coal fines contracts. Loper's recommendations were normally forwarded to Copley. When Loper became aware that renewal of the *587 contract was being considered, he calculated the cost to CWLP of using Bittle coal fines, concluded that it would cost CWLP an additional $ 68,000 per year if the contract were renewed at $ 20.50 per ton in accordance with the proposal, and presented his calculations to his supervisor. The Superintendent of Generation at CWLP, by memorandum dated March 30, 1981, advised petitioner that renewal of the Bittle Coal Company contract at $ 20.50 per ton would not be the lowest bid amongst alternative suppliers of coal fines to CWLP. Nonetheless, on March 31, 1981, the City Council adopted the contract proposed by petitioner. While the renewal contract with Bittle Coal Company was under consideration by the City Council, Bittle paid Hankins $ 5,000 in $ 100 bills. Hankins gave $ 3,000 to petitioner and kept the balance, with petitioner's knowledge and agreement. After the Bittle Coal Company contract was renewed, Bittle made additional payments to Hankins, generally computed at $ 1 per ton of coal fines delivered by Bittle Coal Company to CWLP during a 2-week period. During 1981 and 1982, CWLP used approximately 20,000 to 30,000 tons of coal fines per year. In August 1981, Bittle *588 sought to increase the number of loads of coal fines sold by Bittle Coal Company to CWLP from three truckloads per day to six truckloads per day. Bittle discussed the proposal with Hankins, who discussed it with petitioner. Petitioner agreed to an increase on purchases, provided that Bittle paid to petitioner and Hankins an additional $ .25 per ton, for a total of $ 1.25 per ton, and a lump-sum payment of $ 10,000. Petitioner volunteered to draft a letter to himself from Bittle requesting an increase in purchases. Petitioner provided the draft letter to Hankins, instructing Hankins to copy it in his own handwriting and destroy the original. Hankins delivered the draft letter to Bittle. Bittle caused the letter to petitioner to be typed and mailed it to petitioner on September 1, 1981. During September and October 1981, Bittle paid Hankins $ 1.25 per ton for the coal fines purchased by CWLP during those months and Hankins delivered $ .75 per ton to petitioner. In accordance with the foregoing arrangements, Bittle paid to Hankins the sum of $ 14,733.85 in 1981 and $ 12,384.00 in 1982. Hankins gave petitioner approximately $ 7,603 in 1981 and $ 6,092 in 1982. In late 1982, *589 CWLP stopped purchasing coal fines from Bittle Coal Company. In late 1982 or in 1983, Bittle sued CWLP. The suit was dismissed in 1984 when, as discussed below, charges against petitioner became public. Other Items
In November 1982, petitioner drew a check for $ 4,541 on the account of the Committee to Re-Elect Paul Bonansinga and purchased a cashier's check for $ 4,540 payable to "J. W. Hawkins." Petitioner directed Deborah Davis (Davis), then personnel manager for the City of Springfield and a personal friend of petitioner's, to deposit the proceeds of the cashier's check in her savings account. On December 1, 1982, at petitioner's direction, Davis withdrew $ 4,000 in cash from her savings account and delivered the money to petitioner. Davis retained the balance as compensation for keypunch work performed for petitioner's campaign committee. In the spring of 1982, James Faulker (J. Faulkner) was unemployed. An operating engineer position was open at CWLP, and J. Faulkner inquired of Hankins about the availability of the position. Hankins discussed the matter with petitioner and was told that a number of people were interested in the position. In a subsequent conversation *590 with petitioner, Hankins indicated to petitioner the possibility of a payment by J. Faulkner to secure the job. Petitioner stated to Hankins that a number of people were interested in the operating engineer position, but that another job at CWLP might be available to J. Faulkner. J. Faulkner paid $ 1,000 to Hankins, and Hankins gave $ 500 to petitioner. In September 1982, J. Faulkner was hired by CWLP as a park superintendent. In the spring of 1983, CWLP had an opening for a real estate administrator. J. Faulkner approached Hankins about the possibility of J. Faulkner's wife, Carolin Faulkner (C. Faulkner), obtaining the position. J. Faulkner paid $ 5,000 cash to Hankins, and Hankins gave $ 4,000 to petitioner. J. Faulkner was promoted to the position of Assistant Water Works Operator, and, in November 1983, C. Faulkner was hired as a real estate administrator. During the years in issue, petitioner received $ 200 per month from the City of Springfield for expenses incurred in the operation of his personal automobiles on official business. CWLP also provided City-owned automobiles to its employees to conduct CWLP business. Petitioner frequently used City-owned automobiles. *591 On his tax returns for the years in issue, petitioner claimed unreimbursed (exceeding $ 2,400 per year) automobile expense of $ 985 in 1980, $ 1,205 in 1981, $ 1,364.50 in 1982, and $ 1,913.82 in 1983. Respondent's Determinations
Prior to December 1983, Internal Revenue Service agents commenced an investigation of petitioner. In July 1984, petitioner was charged in an indictment with mail fraud, extortion, and racketeering during the years 1979 through 1984 and with filing false income tax returns for 1980 through 1982, in violation of section 7206(1). After a jury trial, petitioner was convicted by a jury on 3 of the 27 counts in the indictment. On appeal, the conviction on 1 of the 3 counts was reversed, and the conviction was affirmed on 2 counts involving theft of automobile paint and supplies from the City during 1981 and 1982. Hankins pled guilty to charges of mail fraud, racketeering, and filing false income tax returns in relation to his activities at CWLP. In the notices of deficiency, respondent determined that petitioner had unreported taxable income from kickbacks, theft of property and/or services belonging to the City of Springfield, diverted campaign *592 contributions, and extortion payments, in the amount of $ 2,640 for 1980, $ 12,825 for 1981, $ 12,210 for 1982, and $ 5,000 for 1983. Respondent further determined that petitioner was not entitled to deduct the amounts claimed for automobile expenses during those years. The increased deficiencies asserted by respondent were based on receipt of an additional $ 2,000 in converted campaign contributions in 1980 and conversion of the VCR at a cost of $ 1,488 in 1981. The statutory notice for 1980 was sent on June 4, 1985, and assessment of the taxes determined by respondent would be barred for that year if there is no underpayment due to fraud for that year. The statutory notice for 1981, 1982, and 1983 was sent on March 14, 1985, and, in any event, was timely as to those years. OPINION Petitioner denies misappropriation of funds or property belonging to the City of Springfield and denies receipt of any unreported income. He contends that the Court should not accept the testimony of the witnesses against him, all of whom have some complicity in the wrongful conduct on which respondent's determinations are based. At trial and in his brief, petitioner contends that the jury in *593 the criminal case refused to believe those witnesses called by the Government and that the Government is here pursuing in a different forum the same claims lost in the criminal case. [3]
For 1980 and 1981, section 6653(b) imposed an addition to tax *594 equal to 50 percent of the underpayment if any part of the underpayment was due to fraud. For those years, the addition attached to the entire underpayment even if only a portion of it was due to fraud. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962). For 1982 and 1983, section 6653(b) provides: (b) Fraud. -- (1) In general. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. (2) Additional amount for portion attributable to fraud. There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributed to fraud, and (B) for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on *595 the date of the assessment of the tax (or, if earlier, the date of the payment of the tax). [4]
Acquittal in a criminal case, where the Government has a burden of proving beyond a reasonable doubt that a crime was committed, carries little weight in this proceeding, where respondent must prove fraud by clear and convincing evidence. See, e.g., Neaderland v. Commissioner,424 F.2d 639, 643 (2d Cir. 1970), affg. 52 T.C. 532 (1969); Traficant v. Commissioner,89 T.C. 501, 510 n.9 (1987). First, *596 the addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Imposition of the sanction, therefore, is not subject to constraints applicable in criminal proceedings. Helvering v. Mitchell,303 U.S. 391, 401 (1938). Second, in this case we do not see what comfort petitioner takes from the jury's failure to convict on all counts of the indictment. In affirming his conviction on two counts and reversing it on one, [5] the Court of Appeals for the Seventh Circuit commented: Not only did defendant take auto supplies, there was evidence that he extorted $ 32,000 in kickbacks from a CWLP coal supplier, used CWLP materials and labor to construct a garage at his residence, and took an orbital sander purchased by CWLP. The indictment charges that this corruption persisted through the date of defendant's indictment in July 1984. In particular, James Faulkner testified that he approached Hankins in the spring of 1983 about getting his wife a job with CWLP, and eventually offered to pay *597 $ 5,500. According to Hankins, Faulkner paid $ 5,500 cash in May 1983, and Hankins, in turn, gave $ 4,000 to defendant. Faulkner's wife was later hired. Defendant schemed to deprive the citizens of Springfield of their right to faithful service free from the influence of corruption. If any part of his dishonesty came to light, the entire scheme might fail. While it is true that the jury acquitted defendant of selling jobs, this does not mandate the conclusion that defendant's overall scheme had reached fruition by 1983. * * * The jury might have been exercising its "historic power of lenity." * * * Juries frequently convict on some counts but acquit on others because of compassion or compromise. United States v. Fox,433 F.2d 1235, 1238 & n. 22 (D.C. Cir. 1970). [United States v. Bonansinga,773 F.2d 166, 171 (7th Cir. 1985).] *598 In any event, the jury verdict merely decided that the Government had not proven beyond a reasonable doubt the crimes alleged in the indictment. Such a verdict is not surprising where a key witness was also culpable. As indicated by the Court of Appeals for the Seventh Circuit, the jury did not necessarily find that particular events, testified to by Hankins, did not occur. The testimony of particular witnesses, notably Hankins and Bittle in this case, may constitute clear and convincing evidence even though petitioner testifies to the contrary. For the reasons discussed below, we conclude that the testimony of respondent's witnesses is more credible than that of petitioner and that, therefore, respondent has satisfied his burden of proof. Respondent has the burden of proving an underpayment for each year and that at least some part of the underpayment was due to fraud. Section 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. *599 Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. A fraudulent underpayment of taxes may result from an overstatement of deductions as well as an understatement of income. Hicks Co. v. Commissioner,56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Neaderland v. Commissioner,52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). *600 In this case, respondent contends that petitioner had unreported income from a series of illegal sources. The proof of the unreported income is essentially the same as proof of the intent to conceal and to evade taxes. Our discussion of the evidence of unreported income, therefore, is combined with our discussion of the evidence of fraud. We have recognized the difficulty of a taxpayer in proving nonreceipt of illegal income. See Jackson v. Commissioner,73 T.C. 394, 401-403 (1979). In this case, however, respondent has presented specific evidence connecting petitioner to each item of unreported income in issue. Respondent has also shown the value of property other than money received by petitioner. Respondent's primary witness was Hankins, who testified that petitioner was responsible for the arrangement with Bittle and that Hankins delivered cash payments from Bittle to petitioner. Hankins was also the only witness who testified that the money paid by J. Faulkner in relation to employment for himself and his wife was delivered to petitioner. Similarly, Hankins *601 testified that he delivered the auto paint and supplies paid for by the City to petitioner. [6]
Petitioner categorically denies receiving any moneys from Hankins and attempts to discredit Hankins' testimony. Hankins, of course, was convicted on his own guilty plea in relation to the scheme to which he testified. Petitioner presented evidence suggesting other misconduct by Hankins. This evidence is unpersuasive. See Rules 404 and 608, Federal Rules of Evidence. Other witnesses merely testified that they did not observe any connection between petitioner and the payors of the amounts in question. Hankins' testimony, though uncorroborated, is unambiguous and therefore "clear." It is also convincing unless we believe petitioner's denials. Petitioner, however, has denied not only Hankins' testimony but that of a variety of other witnesses. Although none of the witnesses is without fault in the situation, the others are less culpable than Hankins. We have been given no reason to *602 disbelieve them. Copley, for example, specifically testified giving to petitioner cash from Bittle's campaign contributions. The campaign contributions were not disclosed on the annual reports required of such campaigns and apparently were not forwarded to the campaign fund. Davis also reported that campaign funds were delivered in cash to petitioner. Petitioner merely testified that he delivered the $ 4,000 received from Davis to Hankins. The "paper trail" corroborates Davis' testimony but not petitioner's. Butler and Copley each testified that they worked on petitioner's garage and that roof trusses were used in the construction. The evidence establishes purchase of roof trusses by the City, transportation of roof trusses from City property to petitioner's brother's residence by persons including petitioner, transportation of roof trusses to Seman, and transportation of roof trusses to petitioner's residence. Petitioner admits that trusses paid for by the City were used in construction of his garage. He simply asserts that he believed that they belonged to Seman, but he does not contend that he paid Seman for them. A similar analysis applies to the testimony that a sander *603 and other supplies were purchased by the City and delivered to petitioner. He denies knowledge that the items in question belonged to the City. Again, it is sufficient unless petitioner's denials are believed. We do not believe him. Witnesses other than Hankins, Copley, and Davis did not claim to have made direct cash payments to petitioner. Bittle, for example, dealt only with Hankins. He testified that the suggestion for the increase in price of the coal fines did not originate with him and that the form for the contract came to him from Hankins. A letter in petitioner's handwriting further corroborated Hankins' version of the subsequent agreement to increase volume of deliveries. J. Faulkner denied paying any money to petitioner and testified that Hankins attempted to keep J. Faulkner away from petitioner. Davis, on the other hand, testified to several conversations with petitioner in which he told her to bypass usual City procedures in relation to jobs for J. Faulkner and J. Faulkner's wife. Petitioner did not deny any of these conversations with Davis. The absence of direct contacts between the payors of income and petitioner, an elected public official, does not *604 persuade us that Hankins' testimony was not truthful. In the nature of things, petitioner would have been well advised to have a buffer between him and Bittle, J. Faulkner, and others similarly situated. Although it is not impossible that Hankins could have misrepresented that he was accomplishing renewal of Bittle's contract and hiring of the Faulkners through petitioner, the evidence is uncontradicted that petitioner actually accomplished the results desired. Just as it is unlikely that Hankins' scheme could have been accomplished without petitioner's participation, it is unlikely that any scheme to secure kickbacks and extortion payments, embezzle property, and conceal income would be witnessed by those who are uninvolved and innocent. Petitioner admitted that he had possession of the VCR and that he used it to tape movies. He claims, however, that it was used primarily for City business. Davis testified that she saw the VCR at petitioner's residence beginning a few months after it was purchased and repeatedly urged him to return it, finally taking possession of it and returning it to the City premises in 1984, after the investigation of petitioner's conduct had commenced. *605 Petitioner claims that he only used the VCR in 1982 and 1983 and that he had to an identical VCR that could not be distinguished by Davis from the one that Davis saw at petitioner's residence. Petitioner, however, admitted that he used the two VCR's for editing tapes. He did not contradict Davis' testimony about returning the VCR to the City. His admission of possession, the payment of repairs by his campaign committee, and the vagueness of his testimony about business use of the VCR are insufficient to avoid the conclusion that he treated the VCR as his own and thereby converted City property to his own use. The pattern of conduct proven, and the absence of alternative explanations for undisputed events, convinces us that petitioner underpaid his taxes in each year and that the underpayments attributed to unreported income are due to fraud. Those amounts are as follows: Year
Items
Amount
1980
Building materials
$   500.00
Sander
40.00
Campaign contributions
4,100.00
1981
Bittle Coal Company payments
7,603.00
Automotive paint
985.00
VCR (adjusted per respondent's
concession)
1,350.00
1982
Bittle Coal Company payments
6,092.00
Campaign contributions
(Davis to petitioner)
4,000.00
Payment from J. Faulkner
500.00
Automotive supplies
400.00
1983
Use of City employee time
1,000.00
Payments from J. Faulkner
4,000.00
*606 More should be said about respondent's determination as to the value of goods and services diverted by petitioner from the City. Respondent has reconstructed the amounts based on estimates, except with respect to the actual cost of the sander and some of the paint materials. We are convinced that petitioner received the items and knew that they constituted taxable income to him. Respondent's reconstructive method was reasonable, and petitioner has given us no reason to reject it. Thus the underpayments attributable to the foregoing items for 1982 and 1983 are due to fraud for purposes of section 6653(b)(2). The disallowed automobile expenses, however, should be treated separately. There was evidence that petitioner used his personal vehicle for business (as well as some evidence that petitioner used City vehicles for personal matters). He was, however, reimbursed $ 2,400 per year for such business use. He failed to produce any substantiation of the amount of business mileage claimed on his return, and the total, he claimed, 18,000 to 26,000 per year, was improbable in view of the availability and use of City automobiles. There is no direct contradiction, however, of his *607 claims. Although he has not substantiated the amounts claimed and will not be allowed any deductions for them, we cannot conclude that the underpayments attributable to disallowance of the automobile expenses are due to fraud. [7]
As a result of our finding of fraud, the statute of limitations is not a bar to assessment of the deficiency for 1980, even though the statutory notice was sent more than 3 years after the date for filing of the return (or the date that the return was actually filed). Section 6501(c). Petitioner's assertion of the statute of limitations for other years is groundless. Decision will be entered under Rule 155.
Footnotes
1. Except as otherwise noted, all section references are to the Internal Revenue Code as amended and in effect during the years in issue. All references to Rules are to the Tax Court Rules of Practice and Procedure. * Plus 50 percent of the interest due on $ 6,860. ** Plus 50 percent of the interest due on $ 3,086. ↩
2. An issue with respect to the addition to tax under sec. 6661 has been severed for separate disposition. ↩
3. Respondent's brief contained 107 requested findings of fact comprising 44 pages. Many of those requests merely set forth conversations between witnesses and petitioner and observations of those witnesses. Petitioner's brief did not contain any objections to those findings and merely requested 27 alternative findings, which were primarily descriptions of the evidence. Petitioner's brief states that he has "no quarrel with the legal propositions" discussed in respondent's brief. Thus he does not discuss any authority. He asserts, without any reason or authority, that the statute of limitations will bar the addition to tax for all years. This brief totally fails to comply with Rule 151(e)(3) and is totally unhelpful. See Stringer v. Commissioner,84 T.C. 693 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986), and Calcutt v. Commissioner,84 T.C. 716↩ (1985). 4. Sec. 6653(b)(2) of the Internal Revenue Code of 1986 provides: (2) Determination of portion attributable to fraud. -- If the secretary establishes that any portion of an underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer established is not attributable to fraud.
For the reasons appearing in the text, we do not believe that a more precise allocation of the burden of proof as to each individual item would lead to a different result. ↩
5. Petitioner asserts in his brief that he has filed a motion to vacate the remaining convictions on the basis of McNally v. United States,↩ 483 U.S.    (1987), proscribing use of the Federal mail fraud statute in various types of cases.
6. Hankins' testimony was apparently the basis for petitioner's conviction on counts relating to these items. See United States v. Bonansinga,773 F.2d 166, 168↩ (7th Cir. 1985). 7. We recognize that Congress has suggested greater use of negligence and fraud additions where mileage expenses are claimed by employees without any justification. See H. Rept. 99-67 (Conf.) (1985), 1985-2 C.B. 359↩, 363-364, Pub. L. 99-44, 99 Stat. 77. We do not believe that Congress intended to alter the burden of proof in this regard.